Filed 7/22/26  P. v. Ranjbar CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRAM RANJBAR,<br><br>    Defendant and Appellant. | D084692<br><br>(Super. Ct. No. SCN419188) |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Andrew Mestman and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A San Diego jury convicted Pedram Ranjbar of eight counts of sexual assault and found true allegations that he administered a "controlled

substance analog" in the commission of four of the offenses. He challenges the jury's true findings on two grounds. First, he contends the prosecution's expert witness was not qualified to testify that the drugs he administered during the assaults were controlled substance analogs within the meaning of Health and Safety Code section 11401. In his view, the expert's testimony was therefore speculative and unfounded. Second, he contends the trial court judge failed to independently act as a thirteenth juror when evaluating the expert's testimony in response to his motion for a new trial. We conclude both contentions lack merit and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

Statement of the Case

On July 28, 2022, by amended information, the San Diego County District Attorney charged Ranjbar with two counts of forcible sexual penetration (Pen. Code,[1] § 289, subd. (a); counts 1 and 2), and two counts of forcible oral copulation (§ 287, subd. (c)(2)(A); counts 3 and 4). With respect to each count, the information alleged that Ranjbar administered a controlled substance analog in the commission of the offense in violation of section 12022.75. This allegation made each offense subject to an indeterminate sentence of 15 years to life under the One Strike law. (§ 667.61, subds. (b), (c), (e)(6).) The information further charged Ranjbar with four counts of sexual battery by restraint (§ 243.4, subd. (a); counts 5 to 8).

The first jury failed to reach a unanimous verdict and retrial commenced on March 6, 2024. The second jury found appellant guilty on all

---

[1] Undesignated statutory references are to the Penal Code.

counts. They also found true the one strike allegations that Ranjbar administered a controlled substance analog in the commission of the first four counts.

The trial court sentenced Ranjbar on July 5, 2024. The court imposed indeterminate terms of 15 years to life on each of the first four counts, running counts 1 and 2 consecutive and counts 3 and 4 concurrent. For the remaining counts, the court imposed the upper term of four years on counts 5, 6, and 8. The court ran counts 6 and 8 concurrent, and imposed a consecutive one-year term (one-third the middle term) on count 7. The total aggregate sentence was 5 years plus 30 years to life.

## II.

## The Prosecution's Case

A. *Background*

In the spring of 2020, Jane Doe was 21 years old. For a little more than a year, she had been living with her adoptive father, Ranjbar, while she attended college. During this time, Ranjbar's behavior made Jane increasingly uncomfortable. He regularly entered her room and hugged her inappropriately in an extended way for a couple of minutes at a time. He did so even when she told him not to and tried to resist.

During the COVID-19 lockdown, in late May or early June 2020, Ranjbar left for a week on a trip for work. While he was away, Jane had a "Zoom wine night" with friends. Ranjbar did not approve of alcohol consumption, and so, Jane hid the empty bottle in her closet along with an empty bottle of prosecco she had consumed when she tried it for the first time on her 21st birthday.

When Ranjbar returned the next evening, he immediately told Jane she looked hungover and accused her of drinking. Jane eventually admitted she

3

had some wine, and he became enraged. He searched her room and accused her of betraying him. He told her he was going to "treat [her] like an alcoholic . . . in rehab" and "humiliate" and "punish" her.

After this incident, during the month of June, Ranjbar began "interrogating" Jane about her friends and alcohol consumption, he demanded to look through the email and text messages on her phone four or five times a day, he threatened to harm her friends with a machete he kept in the garage, and he hit her a few times "out of nowhere," one time knocking the wind out of her. He had never behaved like this before. He also regularly searched her computer.

Later that month, Ranjbar confiscated Jane's personal journal after discovering entries about him. He also directed her to send him an email listing all the times she consumed alcohol, saying "he was thinking about using it to sue [her] friends and [her] friends' parents."

But, on June 26, 2020, when San Diego County Sherriff's deputies came to Ranjbar and Jane's house for a welfare check regarding an unrelated matter, she told them she was "okay" and denied being abused. She later explained, "I didn't know how to answer the question. I didn't know what counted."

B.    *The Sexual Assaults*

On July 2, 2020, Ranjbar bought three "LIZVIE HD spy camera" devices from Amazon. The shipping confirmation email described each of the devices as a "mini hidden nanny cam . . . with remote viewing night vision." On July 5, Ranjbar installed applications on his phone to enable remote viewing through the cameras.

4

On July 8, 2020, about a week after Ranjbar bought the cameras, Jane met her friend Sophia at a park for a social-distanced picnic. Sophia described Jane as "very quiet," and "distant."

When Jane returned home from the picnic, Ranjbar became enraged and said she was forbidden from that point forward from seeing friends and leaving the house unsupervised. He accused her of downplaying the number of times she had experimented with drinking alcohol. He confiscated her phone, car keys, credit cards, and driver's license, and he used the banking application on her phone to withdraw her entire savings of $2,500 from her bank account.

That night, Ranjbar told Jane "she couldn't be trusted to be wandering about the house at night," and he gave her "a big, pale pill" around the time that she normally went to sleep. He stood close by and watched as she took the pill with water. He also put a dropper of what he described as cannabidiol (CBD) oil under her tongue. The pills made her feel "tired, floaty, and not in her body."

The next day, Jane felt "slower than usual," and not "as alert as [she] usually felt in the morning." Sometime during that day, Ranjbar gave her "a round green pill," and told her it would help with her allergies and anxiety.

Ranjbar continued directing Jane to take the pale pill and oil each night and the green pill each morning from July 8 to July 15, 2020. In addition, after the first two or three days, he increased the number of pale pills from one to two, saying that "she wasn't falling asleep fast enough." According to Jane, "It seemed like the longer I took [the pills] and the more of them he made me take, . . . the fuzzier I was in the morning. Like the harder it was to think straight. And . . . once I fell asleep at night, I couldn't wake back up. And it took a really long time for me to wake back up."

5

On one of the days between July 8 and July 15, 2020, Jane could not remember which one, Ranjbar ordered her to lie face-down on a beanbag in the living room because he was angry with her.  When she complied, he hit her at least five times on the buttocks through her clothing.  He then pulled her pants and underwear down and continued hitting her even harder until he suddenly said, "I think that's enough."

Sometime in mid-July, Ranjbar took Jane's passport and birth certificate away.  He said she would be accompanying him to Arizona for work later that month because she "couldn't be unsupervised."  Ranjbar also began regularly summoning Jane to kiss him on the mouth in a way that made her scared he was going to hurt her in a sexual way.

On July 12, 2020, Ranjbar received the surveillance cameras he had ordered in the mail.  He hid two of them in the bathroom where Jane showered.  He hid another one downstairs in the living room.  After Ranjbar received the cameras, one of the applications that enabled remote viewing on his phone was "opened at least 25 times" on July 15.  The other was used on July 16 at 9:29 a.m.  Ranjbar took pictures of Jane sleeping and showering.

On July 16, 2020, the day before she was supposed to travel to Arizona, Jane awoke at about 5:00 a.m.  She began thinking about how she could get away from Ranjbar at the airport even though she did not have any money or identification.  However, as had been the case since she started taking the pale-colored pills, her "body was really heavy and [she] couldn't think very fast."  She eventually fell back asleep.

When she woke up again, around 10:00 a.m., Ranjbar instructed her to make breakfast.  After going on errands with him, Jane felt nauseous when she returned home.  She lay down to rest on the beanbag, but Ranjbar

6

directed her to change into "something more comfortable" and then summoned her to "get affection."

Ranjbar instructed Jane to lay her head on his lap, but when she did, he suddenly pulled it back. The pull was "forceful" and it scared her. He said she had to obey him and led her to the coat closet in the dining room. Jane saw he had placed "her sister's old mattress" on the floor of the closet. Ranjbar told her to go inside, and he threatened to "keep [her] in there if [she] didn't listen to him."

Once she was inside the closet, Ranjbar told Jane to sit on the mattress so he could spank her again. After she sat down, he told her "to get onto all fours." She complied and he pulled down her pants and underwear and hit her on the buttocks at least 10 times. He inserted his fingers into her vagina and said, "at least you're not all stretched out." He told her to remove her shirt, he squeezed her breasts, and he continued digitally penetrating her.

Ranjbar asked Jane why she did not shave her pubic hair, and then grabbed her hand tightly and directed her upstairs to his bathroom. He told her to "get in the tub," and shaved her pubic and anal areas. Jane could "hear the neighbors outside through the window," but Ranjbar told her she "shouldn't think about screaming because they wouldn't hear [her]."

After washing Jane off in the shower, Ranjbar picked out a dress from her closet and got his camera. He directed her to pose for the camera on the bed in her room while wearing the dress, and he directed her to crawl toward him on all fours while she was naked as he videotaped her. When she seemed uncomfortable and made what he called a "stink face," he said she "needed to stop making that face unless [she] wanted to learn to suck dick, too." He also took close-up pictures of her genitals.

7

Ranjbar put the camera down and again digitally penetrated Jane. He touched her breasts with his hands and mouth, and he performed oral sex on her vagina and anus. He did this while repeatedly saying that her "pussy" and other body parts belonged to him. Eventually, he told her, "I'm not gonna fuck you today, but I'm gonna cum on you," and he went to his bedroom to get lotion.

While Ranjbar was in his bedroom, Jane escaped and ran naked from the house. She reached the neighbors' garage next door, which was open, and told them that Ranjbar had "put his fingers inside me and his mouth on me." She said he "was going to come after [her] and that [they] needed to lock the door." She appeared "frantic," "terrified," and "in a state of panic." Describing her, one of the neighbors said, "I've never seen anyone that scared."

A neighbor wrapped Jane in a towel, took her through the garage into a pantry or laundry room, and called the police. Three minutes later, Ranjbar came out of his house and asked one of the neighbors, " 'Where is she? I'm sick of this shit. She's having an episode. I need to talk to her.' " Ranjbar said Jane "was having an episode because she was autistic and he was frustrated with her not listening to him."

Deputies arrived and found Jane wrapped in a towel. She was crying and "very frightened." She told them Ranjbar had put his fingers and mouth on her genitals, and she requested a rape kit. It was approximately 5:55 p.m.

8

C.    *Law Enforcement Evidence*

Blood and urine samples were collected from Jane on July 16, 2020, at 11:50 p.m. and 11:54 p.m., respectively.  Both samples tested positive for gabapentin and hydroxyzine.[2]  Gabapentin is a prescription antiepileptic drug that can also be prescribed for nerve pain.  Hydroxyzine is a prescription antihistamine drug that can also be prescribed for anxiety or nausea.  Neither drug is listed on California's schedules of controlled substance.[3]

Sheriff's deputies searched Ranjbar's house and found a bottle of pills that each contained 300 milligrams of gabapentin.  The pills were yellow.  They also found CBD oil, a camera, and Jane's phone.  They did not find any green pills or any substance that could be identified as hydroxyzine, but they found several empty pill bottles with no labels on them.

D.    *Expert Testimony About the Effects of Gabapentin and Hydroxyzine*

Dr. Rabia Atayee testified at the second trial about the pharmacological properties of gabapentin and hydroxyzine.  She is a professor of clinical pharmacy at University of California, San Diego (UCSD).  She is also a clinical pharmacist in palliative medicine with more than two decades of

---

[2]    The prosecution's forensic toxicologist explained that Jane's blood sample was tested twice.  The "comprehensive panel" test did not detect gabapentin because the "limit of detection for gabapentin for the comprehensive panel is 1 milligram per liter."  But the other, more sensitive test detected gabapentin at a concentration of less than 0.5 milligram per liter.

[3]    The samples did not test positive for GHB, which is a drug that is commonly used and seen in sexual assault cases.

experience. She received her undergraduate degree in pharmaceutical chemistry from UCSD and her pharmacy doctorate from University of California, San Francisco. In her clinical practice, she regularly prescribes both gabapentin and opioids such as codeine, hydrocodone, hydromorphone, morphine, oxycodone, fentanyl, and methadone.

Atayee was asked to opine as to whether gabapentin causes central nervous system (CNS) depression that is substantially similar to any of the medications on California's Schedule II list of controlled substances as codified in Health and Safety Code section 11055 (Schedule II). The question was relevant to determining whether gabapentin or a combination of gabapentin and hydroxyzine meet the definition of a "controlled substance analog" within the meaning of Health and Safety Code section 11401. Section 11401 provides:

> "[T]he term 'controlled substance analog' means either of the following:

> "(1) A substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance classified in Section 11054 or 11055 or a synthetic cannabinoid compound defined in Section 11357.5.

> "(2) A substance that has, is represented as having, or is intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to, or greater than, the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance classified in Section 11054 or 11055 or a synthetic cannabinoid compound defined in Section11357.5."

Atayee explained that gabapentin releases a chemical called GABA in the brain. GABA slows down the brain and can cause dizziness, sleepiness,

10

blurred vision, confusion, and memory loss, and can make a patient "feel[ ] foggy or like a zombie." It can also cause respiratory depression. In Atayee's opinion, gabapentin's depressive effect on the CNS is substantially similar to the effect of the opioids listed on Schedule II, particularly oxycodone, hydrocodone, and fentanyl, because opioids also increase the level of GABA, although they also decrease other chemicals that help the brain function. Atayee testified that patients she has treated with codeine, hydrocodone, hydromorphone, morphine, oxycodone, fentanyl, and methadone have told her that gabapentin has made them "just as foggy or foggier than the opioids." She further explained that CNS depression is also a side effect of hydroxyzine, and that combining the two drugs together can increase the depressive effect from "somebody feeling a little dizzy or sleepy to really sleepy or their breathing is impacted."

In addition to her opinion that gabapentin and gabapentin in combination with hydroxyzine have substantially similar effects to opioids on the CNS, Atayee evaluated a hypothetical about the likely effects of taking gabapentin in a manner consistent with Jane's testimony. Atayee opined that an individual weighing between 120 and 130 pounds who took 600 milligrams of gabapentin before going to sleep at 11:00 p.m. would feel "very foggy" the next morning at 9:00 a.m., and there would be "lingering" CNS "depressant effects" throughout the next day. She also testified that the amount of gabapentin in Jane's blood was consistent with taking 600 milligrams 24 hours earlier.

### III.

### The Defense Case

Ranjbar called one witness, Dr. Charles O'Connell, who testified that he disagreed with Atayee's opinion that opioids and gabapentin and/or

11

gabapentin in combination with hydroxyzine have a substantially similar effect on the CNS. O'Connell is board certified in toxicology and works as an emergency room physician at both Scripps Health and UCSD. He also spends two days a month on "toxicology call," providing consulting services to four hospitals for overdose patients.

O'Connell agreed that gabapentin and hydroxyzine cause CNS depression. He also testified that gabapentin, when taken in "higher doses" and "repeated doses," can cause clumsiness, unsteadiness, dizziness, drowsiness, sleeplessness, and "trouble thinking." But he characterized the drugs as "both very mildly sedating drugs" as compared to opioids. He explained that opioids cause frequent overdoses where people are "completely comatose and not breathing well at all and we have to give reversal agents." By contrast, gabapentin and hydroxyzine do not act on the "same receptors," and in his experience, do not cause "respiratory depression" and "have very different clinical effects." He explained, "we all know these [drugs] can be mild[ly] sedating. They could make you a little tired. But to compare them to oxycodone and fentanyl and things that are . . . profound CNS inhibitors and can actually put . . . patients in a comatose state with relatively low doses, that is something that's inappropriate."

In addition to disagreeing with Atayee's opinion about the similarity between gabapentin, gabapentin and hydroxyzine, and opioids, O'Connell opined that there was not enough gabapentin or hydroxyzine in Jane's blood samples to perform a retrograde extrapolation and determine amount of medication that was in her blood at time of the alleged sexual assaults on July 16, 2020.

DISCUSSION

I.

*No Error Admitting Expert Testimony About Controlled Substance Analogs*

Ranjbar moved in limine to exclude Atayee's expert testimony. He contends the trial court should have granted the motion because Atayee was not a toxicologist and therefore not qualified to give an opinion about the concentration of gabapentin and hydroxyzine in Jane's system at the time of the sexual assaults. In his view, this is a required element of proof to show substantial similarity within the meaning of Health and Safety Code section 11401, subdivision (b)(2). He contends the court's error requires reversal of the jury's true findings that he administered a controlled substance analog in the commission of four of the assaults within the meaning of sections 667.61 and 12022.75.

Specifically, Ranjbar argues the trial court's ruling "was a fundamental error because it failed to distinguish between the two distinct expert roles required to prove the enhancement. The prosecution's burden required proving not just that gabapentin can cause CNS depression in general, but that the specific amount in the victim's system would have caused effects 'substantially similar' to Schedule II opioids. This required two distinct types of expertise: (1) a forensic toxicologist *to reliably determine what concentration was present at the time of the offense* through retrograde extrapolation . . . and (2) a clinical pharmacologist to opine on the effects of that specific concentration." (Italics added.)

Our review of evidentiary rulings is for abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) "The trial court has considerable latitude in determining whether a

13

witness qualifies as an expert, and its ruling will not be disturbed absent a showing of a manifest abuse of discretion." (*People v. James* (1989) 208 Cal.App.3d 1155, 1164 (*James*).)

Ranjbar's argument lacks merit because it is logically flawed and premised on a misunderstanding of the law. As we explain, the prosecution was not required to establish the concentration of gabapentin and/or hydroxyzine in Jane's system at the time she was sexually assaulted in order to prove the drugs were controlled substance analogs.

Starting with the flaw in Ranjbar's reasoning, he explains the details of his argument in the opening brief as follows:

> "[T]he prosecution had to prove not just that gabapentin was present, but that it was present at a concentration sufficient to produce effects 'substantially similar" to Schedule II opioids. This is impossible without first determining the actual dose. The jury instructions properly required proof that gabapentin had effects 'substantially similar to' specific opioids including hydrocodone, oxycodone, and fentanyl. . . . But without knowing whether Jane had 0.1 mg/L or 10 mg/L of gabapentin [in her blood], any comparison to opioid effects was pure speculation."

The obvious problem with this analysis is that the effects of *any* drug, including Schedule II drugs like hydrocodone, oxycodone, and fentanyl, depend on the concentration. Just like gabapentin and hydroxyzine, the effects of opioid drugs on a person will necessarily vary depending on the concentration of the drug in the person's system. Thus, Ranjbar's reasoning begs the question as to what level of concentration of hydrocodone, oxycodone, or fentanyl constitutes the appropriate comparison point for effects of whatever concentration of gabapentin (and/or hydroxyzine) was in Jane's system at the time of the assault. Should the effects be compared to the

effects of a trace amount of hydrocodone, oxycodone, or fentanyl? A moderate amount? An amount just shy of overdose? Ranjbar provides no answer to this question, and there is no analytically sound answer. The definition Ranjbar proposes for determining substantial similarity, one that requires retrograde extrapolation of a drug's concentration at the time of the offense, is thus a nonsensical and unworkable one.

Ranjbar's proposed definition is also unsupported by legal authority. Health and Safety Code section 11401, subdivision (b)(2) cannot be read to make the definition of a controlled substance analog dependent upon the concentration of a substance in the victim's system at the time of the criminal offense. There are no words to that effect in the statute. As noted, it provides, "A substance that has, is represented as having, or is intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to, or greater than, the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance classified in Section 11054 or 11055 or a synthetic cannabinoid compound defined in Section 11357.5." (Health & Saf. Code, § 11401, subd. (b)(2).) Any such interpretation, moreover, would make no sense in the context of the illegal possession and sales statutes to which Health and Safety Code section 11401 explicitly applies. (See Health & Saf. Code, § 11401, subd. (a) ["A controlled substance analog shall, *for the purposes of Chapter 6 (commencing with Section 11350)* be treated the same as the controlled substance classified in Section 11054 or 11055 or the synthetic cannabinoid compound defined in Section 11357.5 of which it is an analog."], italics added.)

Nor do sections 667.61 and 12022.75 provide a basis for Ranjbar's proposed definition and test. These code sections provide for an alternate

15

sentence of 15 years to life when a defendant is found to have "administered" a controlled substance to the victim. (§§ 667.61, 12022.75.) There is no requirement that the controlled substance—or controlled substance analog as is the case here—be present in the victim's system at a concentration of "therapeutic range" during the sexual assault. To read the statutes otherwise is to read in an element that does not exist.

Ranjbar's other contentions about Atayee's expert testimony about the substantial similarity between the three drugs also lack merit. He concedes that she was qualified to testify about the effects of gabapentin, hydroxyzine, and opioid drugs, and we conclude her testimony that the drugs cause similar effects on the CNS was nonspeculative. As she explained, she based her opinion on her knowledge that gabapentin and opioids both cause increased levels of GABA in the brain, both can cause respiratory depression, and both can cause dizziness, sleepiness, blurred vision, confusion, and memory loss, and can make a patient "feel[ ] foggy or like a zombie." O'Connell's opinion to the contrary goes to the weight of the evidence and was a question for the jury to decide. (*James, supra*, 208 Cal.App.3d at p. 1164 ["The degree of the witness's knowledge goes to the weight of the evidence, not to its admissibility."].)

For all of these reasons, the trial court correctly allowed Atayee to provide her professional opinion that gabapentin and gabapentin together with hydroxyzine have a depressant effect on the CNS that is substantially

16

similar to controlled substances listed on Schedule II without determining the level of concentration of those substances in Jane's system.[4]

II.

*No Error Denying Ranjbar's Motion for a New Trial*

After the jury found Ranjbar guilty, he filed a motion for a new trial under section 1181, subdivision (6) seeking reversal of the one strike allegations. He asserted, "Due to the gravity of the charge and Dr. Atayee's clear inexperience and reliance on outside experts in making her novel opinions, the [trial] Court should have serious doubts about her testimony regarding gabapentin and hydroxyzine being 'substantially similar' analogs to hydrocodone, oxycodone, and fentanyl." He contends the trial court erred when it denied his motion for a new trial because it failed to independently evaluate the evidence.

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*People v. Davis* (1995) 10 Cal.4th 463, 524 (*Davis*).) A trial court abuses its discretion when it applies an incorrect legal standard for a motion for a new trial under section 1181, subdivision (6). (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

Ranjbar contends the trial court's statements on the record when ruling on his motion demonstrate that it did not apply the correct standard to assess

---

[4] Because there was no requirement that Atayee perform a retrograde extrapolation to opine on substantial similarity, the alleged problems Ranjbar identifies with Atayee's testimony about dosage and the likely concentration of gabapentin at the time of the sexual assaults, while potentially relevant to other issues like consent and credibility, are not relevant to the determination of a controlled substance analog. We therefore do not reach them.

the evidence.  When ruling on a motion brought under section 1181, subdivision (6), a trial court "must give the defendant the benefit of its independent conclusion as to the sufficiency of the credible evidence."  *(People v. Redmond* (1969) 71 Cal.2d 745, 759–760.)  The court is "guided by a presumption in favor of the correctness of the verdict and proceedings supporting it." (*Davis, supra*, 10 Cal.4th at p. 524.)  But the court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt."  (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.)  "In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal."  (*Ibid.*)

The trial court's statements on the record plainly show it applied the correct standard.  The court began by reciting the standard itself: "Section 1181, subsection 6 . . . requires this Court, as the trial judge, to independently review the evidence and act as the 13th juror."  The court then compared the testimony by the two experts, Atayee and O'Connell, and said that it found both experts credible.  The court then stated that its evaluation was "guided by the presumption in favor of the correctness of the jury's verdict," and concluded, "*I* do find that there was sufficient evidence, and *I* do find that the elements of the allegation have been met."  (Italics and boldface added.)  We see nothing about these statements that "reveal" the court "used the presumption of the verdict's correctness as a substitute for analysis, not as a starting point for it," as contended by Ranjbar.  They reveal the court correctly conducted an independent review.

Nor is it plausible, as asserted by Ranjbar in his reply brief, that the trial court conflated the standards for assessing motions for a new trial under section 1181, subdivision (6) and the standard for assessing a motion for acquittal under section 1118.1.  To the contrary, the court specifically denied

18

a motion for acquittal brought by Ranjbar at the close of the prosecution's case and recited the correct standard on the record at the beginning of its ruling: "Looking at the standard for the 1118[.1] motion," it is "whether there's evidence in the record, including reasonable inferences to be drawn therefrom, [such that] there is substantial evidence of [the] existence of every element of the offense charged." (See *People v. Watts* (2018) 22 Cal.App.5th 102, 112, fn. 10 [confirming this is the correct standard].) There is thus no basis for inferring the court did not know the difference between the two standards or mistakenly applied the wrong one.

## DISPOSITION

The judgment is affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.

19